UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED NATIONAL INSURANCE COMPANY,<br>Plaintiff,<br>v.<br>ELITE READY-MIX, LLC,<br>Defendant. | Case No. 25-cv-08540-TSH<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 33, 38 |

## I. INTRODUCTION

Plaintiff United National Insurance Company ("United") brings this insurance action against Defendant Elite Ready-Mix, LLC ("Elite"), alleging that United has no duty to indemnify Elite under the parties' insurance contract. ECF No. 1. Pending before the Court are the parties' Cross-Motions for Summary Judgment. ECF Nos. 33-1 ("Pl.'s Mot."), 38 ("Def.'s Mot."). The Court finds this matter suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and **VACATES** the August 20, 2026, hearing. For the reasons stated below, the Court **GRANTS** United's Motion for Summary Judgment and **DENIES** Elite's Motion for Summary Judgment.[1]

## II. BACKGROUND

### A. Factual Background

United, a Pennsylvania corporation with a principal place of business in Pennsylvania, issued a commercial insurance policy (the "United Policy") naming Elite as an insured. Third Am. Compl. ("TAC") ¶¶ 3, 5 (ECF No. 48); Def.'s Answer at 3 (ECF No. 49). Elite, a limited

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 8, 12.

liability company comprised of two members who are California residents, is a concrete supplier. TAC ¶¶ 4, 14; Def.'s Answer at 3–4. This matter arises out of an underlying state court action that names Elite as a defendant. TAC ¶ 12; Def.'s Answer at 4; *see Flatiron West, Inc. v. Elite Ready-Mix, LLC*, Sacramento County Superior Court Case No. 25-cv-000363 (the "*Flatiron* Action").

Overall, United alleges that under the United Policy, United does not have a duty to indemnify Elite for the claims made against Elite in the *Flatiron* Action and that United is entitled to reimbursement from Elite for the sums United paid to settle the *Flatiron* Action on Elite's behalf. TAC ¶¶ 24–25, 29.

Elite alleges that United failed to perform under the United Policy, acted unreasonably in depriving Elite of the benefits of the United Policy, and acted in bad faith regarding the claims against Elite in the *Flatiron* Action. Am. Counterclaim ("AC") ¶¶ 61, 66–67, 72 (ECF No. 24).

**1. Relationship Between Elite And Flatiron**

In June 2020, Flatiron West, Inc. ("Flatiron") entered into a contract with the California Department of Transportation ("Caltrans") for a highway construction project involving the Elmhurst bridge (the "Project"). United's Separate Statements of Facts ("Pl.'s SSF") ¶ 9 (ECF No. 33-2); Elite's Separate Statement of Facts ("Def.'s SSF") ¶ 9 (ECF No. 44). On May 24, 2022, Flatiron and Elite entered into a Purchase Agreement concerning the Project. Declaration of Greg Bridges ("Bridges Decl.") (ECF No. 40), Ex. D ("PA") (ECF No. 40-4).

Elite is a ready mix supplier of concrete—it obtains ingredients from suppliers and mixes them together as concrete at one of its batch plants and delivers the concrete to job sites. Def.'s SSF ¶¶ 27–28; United's Reply Statement of Facts ("Pl.'s RSF") ¶¶ 27–28 (ECF No. 51-1). Under the Purchase Agreement, Elite agreed "to produce ready mix concrete that meets or exceeds" certain "plans and specifications." PA at 9.

In July 2023, Flatiron ordered the ready mix concrete, "6000 psi 8.5 sack with ADVA 190" (the "6000 psi mix"), to be delivered to Flatiron at the Project. Def.'s SSF ¶ 51; Pl.'s RSF ¶ 51; *see* PA at 1. Elite supplied the 6000 psi mix to Flatiron in July 2023. Def.'s SSF ¶ 57; Pl.'s RSF ¶ 57. Flatiron poured this mix into frames of the bridge, encasing various components like rebar and structural steel that were placed prior to pouring concrete. Def.'s SSF ¶ 58; Pl.'s RSF ¶

58.

The 6000 psi mix was required to reach a minimum strength of within 10% of 6000 psi. Def.'s SSF ¶ 59; Pl.'s RSF ¶ 59. However, post pour testing showed that the concrete failed to reach the specified strength because it was chemically inert. Def.'s SSF ¶¶ 59–60; Pl.'s RSF ¶¶ 59–60; *see* Bridges Decl., Ex. L ("Simco Report") at 17 (ECF No. 40-12) ("the vast majority of the product (72%) is inert"). In addition, the 6000 psi mix had abnormal pore structure. Simco Report at 14. Elite avers that it was not aware that the concrete it supplied was chemically inert. Bridges Decl. ¶¶ 108–110.

The bridge frames encased in the 6000 psi mix had a designed service life of 75 years. Simco Report at 19. An expert report produced by an engineering firm evaluated the probability of the bridge frames corroding due to the 6000 psi mix, stating:

> The deterioration mechanism considered was *carbonation-induced steel corrosion*. . . . Calculations showed that the probability of corrosion initiation due to carbonation could exceed 10% after a short period of time (9 years) from the present date on the interior faces of the frames where the concrete cover is only 1". On the exterior faces, where the concrete cover is slightly higher (1 ½"), this is predicted to occur after approximately 26 years. These results are explained by the poor transport properties of the concrete in combination with a low carbonation buffer capacity of the system.
>
> It must be highlighted that carbonation-induced corrosion is generally slow to propagate following its initiation and, therefore, to cause damage to concrete. . . . It is only after a certain period of time following the initiation of corrosion that damage to the structure or loss of serviceability may occur.

*Id.* at 18, 24 (emphasis in original). The firm reached these conclusions after analyzing concrete cores extracted from the poured 6000 psi mix. *Id.* at 10. Elite's retained civil engineering expert opines that the 6000 psi mix cured "with pores which allowed chemicals from the atmosphere into direct contact with the embedded steel and rebar, shortening their life span by corrosion from the designed intent of 75-years to just 8." Declaration of Boris Stein ("Stein Decl.") ¶¶ 2, 77 (ECF No. 43).

Caltrans rejected the concrete supplied by Elite, and all the steel encased in the concrete, because of the concrete's failure to meet specifications. Def.'s SSF ¶ 73; Pl.'s RSF ¶ 73. As a result, Flatiron had to remove and replace the bridge frames encased in the 6000 psi mix. Def.'s

United States District Court
Northern District of California

SSF ¶ 102; Pl.'s RSF ¶ 102. Once Flatiron began this process, Elite's Vice President, Greg Bridges, "visited the project site and personally saw the rebar previously embedded in frames 2/3 were rusted." Bridges Decl. ¶ 154. Bridges avers that "photographs that come from the project site during the demolition" show "the rusted rebar encased within the porous Elite concrete was indeed rusted and degraded." *Id.* (citing Bridges Decl., Ex. CCC (Photographs) (ECF No. 40-22). Elite's damages expert opines that Flatiron alleged $12,887,820 in damages for costs to repair work affected by the defective concrete. Declaration of Michael Kling ("Kling Decl.") ¶¶ 8, 27–28 (ECF No. 42).

**2. The Underlying Action**

Flatiron initiated the *Flatiron* Action against Elite, alleging that Elite did not perform under the Purchase Agreement between Flatiron and Elite. *See* Sec. Am. Compl. ("SAC"), Ex. C (the "*Flatiron* Complaint") (ECF No. 23-3). Flatiron alleged eight causes of action against Elite: (1) Breach of Contract; (2) Breach of Express Warranty of Fitness for Particular Purpose; (3) Express Indemnity; (4) Breach of Implied Warranty of Merchantability; (5) Breach of Implied Warranty of Fitness for Particular Purpose; (6) Negligence; (7) Intentional Misrepresentation; and (8) Negligent Misrepresentation. *Flatiron* Complaint at 1.

Flatiron alleged the following in its complaint against Elite. Flatiron ordered ready mix concrete from Elite that would contain fly ash and "would meet or exceed the particular designed compressive strength of 6,000 pounds per square inch ('psi')." *Id.* ¶¶ 11–12. After placing the concrete into the bridge frames, Flatiron learned that the concrete contained natural pozzolan instead of fly ash. *Id.* ¶ 14. The concrete "did not cure to 6,000 psi as warranted . . . resulting in extensive physical damage to property." *Id.* "Flatiron was forced to demolish, remove, and replace the concrete supplied by Elite and other property and components of the Elmhurst bridge physically damaged by the defective concrete supplied by Elite." *Id.* ¶ 16. As a result of Elite's concrete, Flatiron incurred damages "in excess of $21,000,000.00." *Id.* ¶ 17.

In response to Elite's interrogatories, Flatiron stated:

> The defective concrete damaged the support structure, including the lost-deck formwork, framing, and bridge reinforcement (i.e., rebar) that were constructed by others and caused Flatiron to lose true use of

> the area of the Project. . . . Flatiron had no choice but to demolish the superstructure and rebuild it with competent concrete that met the standards for the Project as to strength and durability, and that complied with the terms of the Purchase Agreement. This process included removal and replacement of all work in place by Flatiron and other trades that was damaged by the defective concrete supplied by Elite.

Declaration of Steven Copeland ("Copeland Decl.") (ECF No. 39), Ex. UU at 15 (Rog Responses) (ECF No. 39-12).

Flatiron presented Elite with a Section 998 offer for $10.9 million. Def.'s SSF ¶ 107; Pl.'s RSF ¶ 107. Flatiron and Elite settled the *Flatiron* Action for $10.9 million, with United tendering $5 million toward the settlement. Pl.'s SSF ¶¶ 22–24; Def.'s SSF ¶¶ 22–24. After reaching the settlement, Flatiron dismissed its complaint against Elite with prejudice. Request for Judicial Notice, Ex. 1 (Dismissal) (ECF No. 34-1).

**3. The Insurance Policies**

The *Flatiron* Action implicates three insurance policies. United issued a commercial excess general liability policy naming Elite as an insured—the policy has a five-million-dollar per occurrence and aggregate limit. Pl.'s SSF ¶¶ 1, 4; Def.'s SSF ¶¶ 1,4. Executive Risk Indemnity ("ERI") issued a commercial general liability policy naming Elite as an insured—the policy has a one-million-dollar limit per occurrence and a two-million-dollar general aggregate limit. Pl.'s SSF ¶¶ 3, 5–6; Def.'s SSF ¶¶ 3, 5–6. ERI agreed to defend Elite in the *Flatiron* Action subject to a reservation of rights. Pl.'s SSF ¶ 18; Def.'s SSF ¶ 18. Allied World Insurance Company issued a second layer excess commercial general liability policy naming Elite as an insured—the policy has a five-million-dollar per occurrence and aggregate limit. Bridges Decl. ¶¶ 14–15.

**a. The United Policy**

The United Policy issued on September 1, 2022. *See* SAC, Ex. A (United Policy) (ECF No. 23-1); Bridges Decl., Ex. B (same) (ECF No. 40-2). The United Policy identifies the ERI Policy as the "controlling underlying insurance" for general liability coverage. Pl.'s SSF ¶ 3; Def.'s SSF ¶ 3. The Coverage Form for the United Policy states:

> The insurance provided under this policy will follow the same provisions, exclusions and limitations that are contained in the applicable 'controlling underlying insurance', unless otherwise

> directed by this insurance. To the extent such provisions differ or conflict, the provisions of this policy will apply. However, the coverage under this policy will not be broader than that provided by the applicable 'controlling underlying insurance'; if there is no coverage under any applicable 'controlling underlying insurance', there is no coverage under this policy.

SAC, Ex. A at 11.

The United Policy contains a section, "Insuring Agreement," that states in pertinent part:

> a. We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this policy applies.
>
> We will have the right and duty to defend the insured against any suit seeking damages for such 'injury or damage' only when the applicable limits of 'controlling underlying insurance' and the applicable limits of any other policy of insurance affording coverage for any claims asserted in such suit have been exhausted in accordance with the provisions of such 'controlling underlying insurance' or other policy of insurance, as applicable.
>
> When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit damages for 'injury or damage'.
>
> However, we will have no duty to defend the insured against any suit seeking damages for which insurance under this policy does not apply.
>
> At our discretion, we may investigate any 'event' that may involve this insurance and settle any resultant claim or suit, for which we have the duty to defend.

*Id.*

The United Policy contains a section, "Definitions," that states in pertinent part:

> The definitions applicable to any 'controlling underlying insurance' also apply to this insurance. In addition, the following definitions apply.
>
> . . .
>
> 3. 'Event' means an 'occurrence', offense, accident, act or other event, to which the applicable 'controlling underlying insurance' applies.
>
> 4. 'Injury or damage' means any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event'.
>
> . . .
>
> 6. 'Retained limit' means the available limits of 'controlling underlying insurance' and the applicable limits of any other policy of

United States District Court
Northern District of California

> insurance affording coverage for any aspect of claims or suits covered under this policy, including self-insured amounts applicable to such claims or suits.
>
> 7. 'Ultimate net loss' means the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of:
>
> a. Settlements, judgments, binding arbitration; . . . .

*Id.* at 20.

**b. The ERI Policy**

The ERI Policy issued on September 1, 2022. *See* SAC, Ex. B (ERI Policy) (ECF No. 23-2); Bridges Decl., Ex. A (same) (ECF No. 40-1). The ERI Policy contains a section, "Insuring Agreement," that states in pertinent part:

> a. We will pay damages that the insured becomes legally obligated to pay for 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.
>
> . . .
>
> b. This insurance applies to 'bodily injury' and 'property damage' only if:
>
> (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . .

SAC, Ex. B at 14.

The section, "Exclusions," in the ERI Policy states that the insurance does not apply to "'[p]roperty damage' to 'your product' arising out of it or any part of it." *Id.* at 17.

The ERI Policy contains a section, "Definitions," that states in pertinent part:

> 19. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> . . .
>
> 24. 'Property damage' means:
>
> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be

> deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.
>
> . . .
>
> 29. 'Your product':
>
> a. Means:
>
> (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> (a) You; . . . .

*Id.* at 28–29.

**4. The Parties' Actions**

On February 19, 2025, United sent Elite a letter disclaiming coverage under the United Policy for the *Flatiron* Action. Copeland Decl., Ex. OO (Letter) (ECF No. 39-6). The letter states that Flatiron alleges: "Flatiron was forced to remove and replace all non-conforming work that was damaged by the placement of the defective concrete. The cost to remove and replace it is $45 million." *Id.* at 4. The letter goes on to state:

> The damage to the formwork, soffit plywood and rebar resulted not from the defective work itself, but from the remediation of such work, and is thus not 'property damage.' United National reserves the right to disclaim coverage in this matter on the grounds that the 'property damage' requirement is not satisfied.

*Id.* at 13.

On March 12, 2025, United issued a coverage position letter to Elite stating that because ERI was defending Elite in the *Flatiron* Action and had not exhausted its limits, United's obligations under the United Policy have not been triggered. Pl.'s SSF ¶ 19; Def.'s SSF ¶ 19. United reserved the right to disclaim coverage and to seek reimbursement of any sums paid in settlement pursuant to *Blue Ridge v. Jacobsen*. *Id.*

In October 2025, both Elite and Flatiron contacted United, demanding that United resolve the *Flatiron* Action. Pl.'s SSF ¶¶ 22–23; Def.'s SSF ¶¶ 22–23. Flatiron demanded that United pay $5 million toward a settlement. *Id.* And Elite stated that the insurers should settle the

*Flatiron* Action for the $10.9 million requested by Flatiron. *Id.* On November 7, 2025, United notified Elite of United's intent to tender $5 million toward a settlement, subject to a complete reservation of rights including the right to seek reimbursement. Pl.'s SSF ¶ 24; Def.'s SSF ¶ 24.

**B. Procedural Background**

The *Flatiron* Action commenced on January 6, 2025, when Flatiron filed a complaint in the Sacramento Superior Court. *Flatiron* Complaint at 1. The *Flatiron* Complaint was dismissed with prejudice on December 29, 2025. ECF No. 34-1.

On October 7, 2025, United filed this action against Elite, alleging one cause of action for Declaratory Relief. ECF No. 1. On October 14, 2025, United filed a First Amended Complaint ("FAC"), alleging the same cause of action. ECF No. 7.

On October 28, 2025, Elite filed an answer to the FAC. ECF No. 10. That day, Elite also filed a Counterclaim against United, alleging five causes of action: (1) Breach of Contract; (2) Breach of Covenant of Good Faith and Fair Dealing; (3) Breach of Duty to Pay Covered Claim; (4) Bad Faith; and (5) Declaratory Relief.[2] ECF No. 14. On December 18, 2025, United filed an answer to the Counterclaim. ECF No. 17.

On December 29, 2025, United filed a Second Amended Complaint ("SAC"), alleging two causes of action: (1) Declaratory Relief of No Duty to Indemnify; and (2) Reimbursement of Settlement Payment. ECF No. 23. United seeks, *inter alia*, a declaratory judgment that no coverage is owed to Elite under the United Policy for the *Flatiron* Action and that Elite must reimburse United the sums paid by United to settle the *Flatiron* Action. SAC at 10. That day, Elite filed an answer to the SAC. ECF No. 25.

On December 29, 2025, Elite filed the operative Amended Counterclaim ("AC"), alleging four causes of action against United: (1) Breach of Contract; (2) Breach of Covenant of Good Faith and Fair Dealing; (3) Bad Faith; and (4) Declaratory Relief. ECF No. 24. Elite seeks, *inter alia*, damages and a declaratory judgment that the losses claimed by Flatiron against Elite are covered under the United Policy and that United owes Elite an obligation of defense and coverage

[2] Elite erroneously styles its counterclaim filings as ones for crossclaims. ECF Nos. 14, 24.



United States District Court
Northern District of California

United States District Court
Northern District of California

under the United Policy. AC at 17–18. On December 30, 2025, United filed its operative Answer to the Amended Counterclaim. ECF No. 26 ("Pl.'s Answer").

On June 29, 2026, United filed the operative Third Amended Complaint ("TAC").[3] ECF No. 48. United alleges the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 and jurisdiction under the Declaratory Judgment Act (28 U.S.C. § 2201). TAC ¶ 1. On July 3, 2026, Elite filed its operative Answer to the TAC. ECF No. 49 ("Def.'s Answer").

On June 4, 2026, United filed its instant Motion for Summary Judgment. ECF Nos. 33 (Not.), 33-1 ("Pl.'s Mot."). United also filed a Request for Judicial Notice. ECF No. 34. On June 27, 2026, Elite filed a combined Opposition to United's Motion and Elite's instant Motion for Summary Judgment. ECF No. 38 ("Def.'s Mot."). On July 20, 2026, United filed a combined Opposition to Elite's Motion and Reply to its Motion. ECF No. 51 ("Pl.'s Opp."). On August 3, 2026, Elite filed a Reply to its own Motion. ECF No. 52 ("Def.'s Reply").

## III. LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court "to scour the record in search of a genuine issue of triable fact." *Keenan v.*

[3] The TAC is substantively the same as the SAC except for the TAC adds jurisdictional allegations. *See* ECF Nos. 36, 37, 47.

*Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Cafasso, U.S. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (noting the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations") (cleaned up). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see also Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (cleaned up).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (cleaned up).

## IV. DISCUSSION

United moves for summary judgment on both its claims in the TAC and on Elite's Amended Counterclaim. Pl.'s Mot. at 6–7. Elite moves for summary judgment on its declaratory judgment cause of action in its Amended Counterclaim. Def.'s Mot. at 1–2.

In sum, the Court concludes that Elite fails to demonstrate that it was liable to Flatiron for "property damage" covered under the United Policy. Therefore, because United does not have a duty to indemnify Elite for the claims Flatiron made against Elite, summary judgment in United's favor is warranted on United's claims. The Court further concludes that summary judgment in United's favor is warranted on Elite's Amended Counterclaim.

United States District Court
Northern District of California

**A. Request For Judicial Notice**

United requests the Court take judicial notice of two documents:

> 1. The Complaint filed by Flatiron West, Inc. on January 6, 2025, in the California Superior Court, Sacramento County Case No. 25CV000363 ('Underlying Lawsuit') against Elite Ready-Mix, LLC ('Elite'), a true and correct copy of which is attached as Exhibit C to United National's Second Amended Complaint in this matter, ECF #23-3.
>
> 2. The Complaint in the Underlying Lawsuit was dismissed with prejudice on December 29, 2025. A true and correct copy of the entered dismissal is attached hereto as Exhibit 1.

ECF No. 34. United argues that "[j]udicial notice of these facts and documents is proper because they are records of a court of this state, and it is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* Elite does not oppose United's request. *See generally* Def.'s Mot.

Under the Federal Rules of Evidence, the Court may take judicial notice of matters that are (1) generally known within the trial court's territorial jurisdiction; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

Here, the Court agrees that it is appropriate to take judicial notice of the two documents requested by United. Courts may take judicial notice of documents filed in a court proceeding. *See United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018) ("A court may take judicial notice of undisputed matters of public record, which may include court records available through PACER."); *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting court may take judicial notice of "documents on file in federal or state courts"). Therefore, the Court takes judicial notice of the two documents requested by United because they are documents filed in state court. In taking judicial notice of these records, the Court only takes notice of their existence and not "for the truth of the matter asserted therein." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010).

**B. Evidentiary Issues**

With its combined Opposition/Reply, United filed a separate document titled, "Objections

to Evidence Submitted by [Elite]." ECF No. 51-6. United also lists objections throughout its Reply Statement of Facts. *See generally* Pl.'s RSF.

Regarding motion practice, the Civil Local Rules state:

> Any opposition to a motion may include a proposed order, affidavits, or declarations, as well as a brief or memorandum under Civil L.R. 7-4. Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum.

Civ. L.R. 7-3(a); *see also id.* at 7-3(c) ("Any evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum.").

Here, United's evidentiary objections to evidence Elite submitted with its combined Motion/Opposition are contained in separate documents, not in United's Opposition/Reply as required by the Local Rules. Accordingly, the Court **STRIKES** United's evidentiary objections that are not stated within its combined Opposition/Reply brief. *Cf. IT Casino Sols., LLC v. Transient Path, LLC*, No. 21-cv-09872-WHO, 2022 WL 17968078, at *5 n.3 (N.D. Cal. Sept. 22, 2022) (striking party's evidentiary objections not contained in its opposition); *Motu Novu, LLC v. Percival*, No. C-16-06545-SBA, 2018 WL 3069316, at *2 (N.D. Cal. May 7, 2018) (striking separate objections to declarations in plaintiff's opposition where objections were not included within defendant's reply brief).

### C. Summary Judgment On United's Claims

Overall, the parties dispute whether the United Policy requires United to indemnify Elite for the claims Flatiron made against Elite. United argues that summary judgment in its favor is warranted on its claims because Elite cannot show that the *Flatiron* settlement "(1) resulted from an 'occurrence' within the definition of the ERI Policy and (2) resulted from 'property damage' caused by such an occurrence." Pl.'s Mot. at 15:7–20:19. United further argues that even if coverage attaches, exclusions apply to bar coverage. *Id.* at 20:20–22:10.

In California, "interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Id.* But within a policy, "[i]f contractual language is clear and explicit, it governs." *Bank of the W. v. Superior Ct.*, 2 Cal.

4th 1254, 1264 (1992).

A commercial general liability policy "is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause." *Waller*, 11 Cal. 4th at 16. "The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998). "And, once an insured has made this showing, the burden is on the insurer to prove the claim is specifically excluded." *Id.* Courts "generally interpret the coverage clauses of insurance policies broadly, in order to protect the objectively reasonable expectations of the insured." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 667 (1995). In contrast, "exclusions are construed narrowly." *Waller*, 11 Cal. 4th at 16.

Standard commercial general liability insurance policies provide "that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for any covered claim." *Buss v. Superior Ct.*, 16 Cal. 4th 35, 45 (1997). "The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved." *Id.* In comparison, the duty to defend is broader than the duty to indemnify—an insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993) (emphasis in original) (citation omitted).

Here, the parties agree that the United Policy follows the ERI Policy, and that the United Policy provides coverage for accidental damage to the property of others. Pl.'s Mot. at 15:7–18:5; Def.'s Mot. at 10:24–14:13; Def.'s Reply at 1:5–7; *see* United Policy at 11, 20; ERI Policy at 14, 28–29. The parties also agree that Elite bears the burden of establishing coverage under the United Policy. Pl.'s Mot. at 15:7–14; Def.'s Mot. at 14:18–15:14. As discussed below, the Court concludes that Elite fails to meet this burden. Therefore, United is entitled to summary judgment on its claims and to reimbursement of the $5 million United paid toward the settlement in the *Flatiron* Action.

Accordingly, the Court **GRANTS** United's Motion for Summary Judgment on Claims 1 and 2 of the TAC.

United States District Court
Northern District of California

**1. *Blue Ridge* Requirements**

The Court first addresses the threshold requirements that an insurer must meet to file a declaratory relief action to determine coverage where the insurer has paid a settlement on a claimant's behalf. Pl.'s Mot. at 6:9–12.

In *Blue Ridge Ins. Co. v. Jacobsen*, the California Supreme Court held that in certain circumstances, an insurer may seek reimbursement for a settlement paid on behalf of its insured, even in the absence of the insured's express agreement. 25 Cal. 4th 489, 502 (2001). An insurer must satisfy three "prerequisites for seeking reimbursement for noncovered claims included in a reasonable settlement payment: (1) a timely and express reservation of rights; (2) an express notification to the insureds of the insurer's intent to accept a proposed settlement offer; and (3) an express offer to the insureds that they may assume their own defense when the insurer and insureds disagree whether to accept the proposed settlement." *Id.*

Here, United asserts that it complied with the *Blue Ridge* requirements. Pl.'s Mot. at 14:9–15:6. United notified Elite that it reserved the right to disclaim coverage and seek reimbursement of any sums paid on Elite's behalf; United notified Elite that it intended to tender an amount toward settlement; and Elite stated to United that United should accept the settlement offer from Flatiron. Pl.'s SSF ¶¶ 19, 22–24. Elite does not dispute these facts. Def.'s SSF ¶¶ 19, 22–24; *see* Pl.'s Opp. at 9:14–15.

Accordingly, the Court finds that the *Blue Ridge* requirements are satisfied such that United is permitted to seek reimbursement for sums it paid to settle the *Flatiron* Action on Elite's behalf.

**2. Coverage For Property Damage**

The parties dispute whether Elite has demonstrated that covered property damage occurred. The parties agree that Elite is not covered for costs associated with repairing Elite's defective concrete supplied to Flatiron. Pl.'s Mot. at 17:12–24; Def.'s Mot. at 10:8–19; *see* ERI Policy at 17. The question is whether Elite's concrete caused physical damage to the bridge frames such that the cost to repair the bridge frames is covered. United argues that costs associated with removing and repairing the bridge frame components are not covered because they resulted from

"remediation of the defective work performed" by Elite, not "from the installation" of Elite's defective concrete. Pl.'s Mot. at 18:6–12. Elite contends that Elite's defective concrete caused "damage to other aspects of [Flatiron's] work such as rusting/degrading the rebar." Def.'s Mot. at 14:18–22:7. In sum, the parties do not disagree over the meaning of any policy language—they disagree over the application of law to the facts of the case.

The ERI Policy (which the United Policy follows) defines property damage as "[p]hysical injury to tangible property."[4] ERI Policy at 28–29. "This definition is the standard definition currently used by the insurance industry nationwide." *F & H Constr.*, 118 Cal. App. 4th at 371–72. Applying that definition, the prevailing view under California law "is that the incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system." *Id.* at 372. "California cases consistently hold that coverage does not exist where the only property 'damage' is the defective construction, and damage to *other* property has not occurred." *Reg'l Steel*, 226 Cal. App. 4th at 1393 (emphasis in original). As such, "property damage is not established by the mere failure of a defective product to perform as intended"; "[n]or is it established by economic losses such as the diminution in value of the structure or the cost to repair a defective product or structure." *F & H Constr.*, 118 Cal. App. 4th at 372 (cleaned up).

Here, the Court finds that the undisputed material facts show that Flatiron's claims against Elite were not covered under the United Policy. The parties dispute whether the 6000 psi mix

---

[4] The ERI Policy also provides a second definition for "property damage": "Loss of use of tangible property that is not physically injured." ERI Policy at 28–29. However, this provision is not implicated here. "The measure of damages for the loss of use of personal property may be determined with reference to the rental value of similar property which the plaintiff can hire for use during the period when he is deprived of the use of his own property." *F & H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 377 (2004) (citation omitted). While Elite makes a passing reference to Flatiron's "loss of use [of property] during reconstruction of the damaged work," it does not assert that Flatiron's damages stemmed from lost rental value. Def.'s Mot. at 14:18–15:14; *see F & H Constr.*, 118 Cal. App. 4th at 377 (holding provision did not apply where claimant sought only costs "unrelated to rental value"). In any event, any "attempts to bring the defective work within the 'loss of use' provisions of the [United] Policy fails: any loss of use was occasioned by the necessity of repairing [Elite's] defective [concrete], a risk not covered by the [United] Policy." *Reg'l Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal. App. 4th 1377, 1393 (2014).

caused property damage to components of the bridge frames when those components were encased in the concrete mix. To resolve this dispute, the Court looks at the allegations in the *Flatiron* Complaint and any extrinsic evidence showing that the bridge frames were damaged by Elite's concrete. *See Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal. App. 4th 1, 89 (1996) (explaining where case has not proceeded to trial, the court "may properly determine questions of insurance coverage on the basis of the underlying pleadings and such other evidence as is available"); *cf. Horace*, 4 Cal. 4th at 1081 (analyzing whether allegations in underlying complaint and facts extrinsic to complaint demonstrated possibility that claim may be covered by the policy to determine whether duty to defend attached); *Webcor Constr., LP v. Zurich Am. Ins. Co.*, 372 F. Supp. 3d 1061, 1071 (N.D. Cal. 2019) (analyzing whether "allegations or extrinsic facts suggesting that the defective work or materials caused damage to *other property*" exist in duty to defend case) (emphasis in original).

As to Flatiron's allegations, United argues that they "do not satisfy the insuring agreement 'property damage' requirement." Pl.'s Mot. at 20:17–19. The Court agrees. In its complaint, Flatiron alleged that Elite's concrete "did not cure to 6,000 psi as warranted . . . resulting in extensive physical damage to property"; and that "Flatiron was forced to demolish, remove, and replace the concrete supplied by Elite and other property and components of the Elmhurst bridge physically damaged by the defective concrete supplied by Elite." *Flatiron* Complaint ¶¶ 14, 16. Thus, Flatiron alleged specific facts showing that Elite's concrete was defective for failing to reach a specified strength. But there are no allegations describing the type of damage sustained by the bridge frames or how the concrete caused damage to the frames. As such, Elite's argument that the "Court need only look at the statements made by [Flatiron] to grant Elite's motion and deny [United's]" falls flat. Def.'s Reply at 1:2–22. "It is the *factual* allegations of the underlying complaint, and not boilerplate allegations of 'costs to repair property damaged by deficient work' that are the basis for the Court's analysis." *Webcor*, 372 F. Supp. 3d at 1074 (emphasis in original); *see* Pl.'s Mot. at 19:20–20:10; Pl.'s Opp. at 18:9–20. Flatiron's conclusory allegations do not demonstrate that its claims against Elite are covered and thus do not trigger a duty for United to indemnify Elite. *Cf. Armstrong*, 45 Cal. App. 4th at 110 ("as a general rule conclusory

allegations are not enough to give rise to a duty to defend").

Next, United argues that the evidence shows Flatiron's damages were caused by replacing Elite's defective concrete, not by replacing damaged property of others. Pl.'s Mot. at 18:6–12. In United's view, costs associated with "ripping and tearing the components of the bridge that were embedded within Elite's concrete" constitute "remediation" work, "not 'property damage' within the meaning of the policy." Pl.'s Opp. at 15:14–18:8 (cleaned up). United is correct that under California law, "cost to repair a defective product or structure" is not "property damage." *F & H Constr.*, 118 Cal. App. 4th at 372. Elite responds that evidence shows that its defective concrete caused damage to bridge components because the concrete "prematurely rusted the embedded steel and rebar," and "if left in place would have resulted in the premature failure of the bridge and freeway." Def.'s Mot. at 8:4–9:24. To support its argument, Elite points to expert reports and declarations, photographs of the bridge frames, Flatiron's interrogatory responses, and a purported admission by United. *Id.* at 8:4–10:22; Def.'s Reply at 2:16–3:9, 5:21–7:6.

The Court finds that none of Elite's evidence demonstrates that its defective concrete caused actual physical damage to bridge components. First, as with its complaint, Flatiron's interrogatory response makes the conclusory allegation that "[t]he defective concrete damaged the support structure"—the response is more concerned with the concrete's lack of strength and durability than specific damage to bridge components. Copeland Decl., Ex. UU at 15. Second, United's letter to Elite does not "admit" property damage; instead, it merely recites Flatiron's allegations. Pl.'s Opp. at 18:21–19:3; *see* Copeland Decl., Ex. OO at 4. Third, Elite contends that evidence from its experts demonstrates "the concrete's defective pores allowed the internal steel and rebar to rust and degrade" and that "the metal rusted as a result of the pores." Def.'s Reply at 5:21–26. But none of the experts say that the steel was physically damaged, by corrosion or otherwise. Pl.'s Opp. at 19:4–13. Simply put, Elite's experts do not say what Elite claims they say. For example, the Simco Report states for the interior faces of the bridge frames, there is a ten percent probability of steel corrosion initiation after nine years. Simco Report at 18, 24. In other words, corrosion *may start* in several years. Corrosion that *may* start is not tantamount to corrosion that *has* started, as Elite claims. *See* Def.'s Mot. at 8:17–24 ("The reaction of the

moisture, salt and structural steel was determined to have prematurely rusted the embedded steel and rebar[.]"). Elite's civil engineering expert concurs, opining that Elite's concrete would cause the bridge frames to have a shortened lifespan due to corrosion, after several years.[5] Stein Decl. ¶¶ 2, 77. And Elite's damages expert merely states that Flatiron claims damages from costs to repair work affected by the defective concrete. Kling Decl. ¶¶ 8, 27–28. Finally, contrary to Elite's assertion, Elite's photographs of "degraded rebar and steel" do not show "the metal rusted as a result of the pores." Def.'s Reply at 5:21–7:6. Elite submits the photographs with a declaration by Bridges who avers they depict "the rusted rebar encased within the porous Elite concrete." Bridges Decl. ¶ 154, Ex. CCC. Bridges does not indicate that the concrete *caused* any purported rusting; nor does he explain how he is qualified to opine on causation as he does not state that he possesses education or expertise in engineering or materials science.

Elite next argues that even if there is no evidence that the bridge frames showed present damage, coverage attaches because "the defective concrete became bound together" with the bridge components and "threatened damage to other aspects of the bridge." Def.'s Mot. at 14:18–22:7. California courts have defined "property damage" to include physical harm to an entire structure caused by introducing a hazardous contaminant into the structure. *Webcor*, 372 F. Supp. 3d at 1071; *see* Pl.'s Mot. at 20:11–16; Def.'s Mot. at 15:15–20:26, Pl.'s Opp. at 12:12–15:13, 19:4–26; *Armstrong*, 45 Cal. App. 4th at 92 (holding where "potentially hazardous material [asbestos] is physically touching and linked with the building, and not merely contained within it, the injury is physical even without a release of toxic substances into the building's air supply"); *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 866 (2000) (holding presence of potentially injurious material (wood splinters) in diced roasted almonds in

[5] In its Reply, Elite argues that Stein opines that "the internal steel and rebar within frames 2/3 had begun to rust and degrade from exposure to the atmosphere through the pores within the concrete." Def.'s Reply at 6:7–13. Stein bases this statement on the Simco Report. *See* Stein Decl. ¶ 94 ("In reviewing the Simco report back in 2024 when it was released by Simco, located at Exhibit L to the Bridges Declaration, the document noted that in the internal steel and rebar within frames 2/3 had began to rust and degrade from exposure to the atmosphere through the pores within the concrete."). But the Simco Report says nothing of the sort; nor could it as it only analyzed Elite's concrete, not the steel from the bridge frames. *See* Simco Report at 10. Because Stein does not provide a basis for this opinion—beyond the Simco Report—the Court does not consider it here.

nut clusters caused property damage to nut clusters); *Watts Indus., Inc. v. Zurich Am. Ins. Co.*, 121 Cal. App. 4th 1029, 1044 (2004) (holding "municipality's water, as a whole, is damaged" by presence "of lead contamination of water"). Those cases focus on the threat of harm to human health—through inhaling asbestos, eating wood splinters, or drinking water that contains lead. However, courts adjudicating disputes that do not involve contamination by hazardous materials find these cases inapposite. Pl.'s Opp. at 13:6–15:13; *see F & H Constr.*, 118 Cal. App. 4th at 374–75 (explaining cases "are inapposite because they involved contamination by hazardous materials"). And here, "Flatiron asserted no claims that the defective concrete mix supplied by Elite was hazardous or caused damage to other portions of the structure." Pl.'s Opp. at 15:7–13.

Elite argues that damage to the bridge frames falls within the exception for hazardous materials because the concrete was "hazardous to the embedded metal." Def.'s Reply at 10:5–11:2. Perhaps a clever play on words; however, this argument fails for two reasons. First, the hazardous material cases all involve inherently dangerous materials that cause immediate danger to human health, not to an inanimate object like steel. Indeed, this is consistent with the meaning of "hazardous." *See Hazardous*, Black's Law Dictionary (12th ed. 2024) ("Fraught with risk; dangerous, esp. to people's health or safety"); *Hazardous*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hazardous (last updated Aug. 2026) ("involving or exposing one to risk (as of loss or harm)"). Second, even if we are concerned about the "health" of the steel, according to Elite's expert, it is chemicals from the atmosphere—not the concrete—that pose a "threat" to the steel. Stein Decl. ¶ 77. Therefore, Elite fails to show that there was "property damage" to an entire structure caused by introducing a hazardous contaminant into the structure.

Accordingly, the Court concludes that Elite fails to show that costs associated with removing and repairing the bridge frame components are covered as "property damage" under the United Policy. As such, the Court need not determine whether the exclusions in the United Policy bar coverage. *See Waller*, 11 Cal. 4th at 16 ("Before even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within the policy terms.") (cleaned up).

**D. Summary Judgment On Elite's Counterclaim**

United argues that summary judgment in its favor is warranted on Elite's Amended Counterclaim because if "there is no coverage, there can be no action for breach of contract, breach of the implied covenant of good faith and fair dealing or 'bad faith' as a matter of law." Pl.'s Mot. at 22:11–16. Elite contends the Court should deny United's Motion because "the material evidence and caselaw" require such denial. Def.'s Mot. at 27:23–29:8.

Elite argues that summary judgment in its favor is warranted on its declaratory relief cause of action because "the [United] Policy, facts and California caselaw" support granting Elite's Motion "for a declaration that [United] had a duty to cover Elite's exposure to [Flatiron's] losses." *Id.* at 14:13–17.

As discussed, the Court concludes that United does not have a duty to indemnify Elite for losses Elite sustained in the *Flatiron* Action. Accordingly, the Court **DENIES** Elite's Motion for Summary Judgment on its declaratory relief cause of action in the Amended Counterclaim.

The remaining question is whether Elite can sustain its other causes of action if Elite fails to demonstrate coverage under the United Policy. The Court concludes that it cannot.

To prevail on a breach of contract claim under California law, a plaintiff must prove "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). "Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009) (emphasis in original). Whether a party breached a contract is a question of fact. *Locke v. Warner Bros.*, 57 Cal. App. 4th 354, 365 (1997).

Under California law, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original). "Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App.

3d 1371, 1395 (1990). Whether the implied covenant has been breached is a question of fact. *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001).

The implied covenant "applies equally to insurance policies, which are a category of contracts." *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000). "[A] liability insurance policy's express promise to defend and indemnify the insured against injury claims implies a duty to settle third party claims in an appropriate case." *Id.* at 401. "More specifically, the insurer must settle within policy limits when there is substantial likelihood of recovery in excess of those limits." *Id.* (cleaned up). Further, "an insurer's breach of the implied covenant will provide the basis for an action in tort." *Id.* at 400 (cleaned up).

"Under California law, 'insurance bad faith' refers to a breach of the implied covenant of good faith and fair dealing as that covenant applies to insurance policies. An insurer breaches this covenant when it acts unreasonably in discharging its obligations under the policy." *Gentry v. State Farm Mut. Auto. Ins. Co.*, 726 F. Supp. 2d 1160, 1166 (E.D. Cal. 2010) (citing *Crisci v. Sec. Ins. Co. of New Haven, Conn.*, 66 Cal. 2d 425, 430 (1967)).

Here, the Court finds that Elite fails to adduce evidence of required elements for each of its claims. First, Elite argues that United's "wrongful denial of coverage" is "a breach of contract." Def.'s Reply at 27:23–29:8. Because the Court concludes that Elite fails to establish coverage, United did not breach the parties' contract by denying coverage. As Elite does not point to any other breach by United, Elite cannot maintain a cause of action for breach of contract. Second, Elite argues that United acted in bad faith by failing to timely investigate the facts, attempting to "undo the payment it made to [Flatiron] by subsequently suing Elite in this litigation," and ignoring or hiding "ample photos and scientific reports" showing "resultant covered property damage." *Id.* As discussed, the Court finds that under controlling California law, United properly brings suit against Elite to recover the settlement payment; and Elite's proffered evidence does not show property damage. In addition, Elite proffers no evidence showing that United "failed to investigate." Pl.'s Opp. at 26:1–27:8. Finally, there is no dispute that United "paid its full policy limit in settlement of the claim against Elite." *Id.* Therefore, Elite's remaining causes of action fail.

Accordingly, the Court **GRANTS** United's Motion for Summary Judgment on Elite's Amended Counterclaim.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** United's Motion for Summary Judgment and **DENIES** Elite's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: August 14, 2026

THOMAS S. HIXSON
United States Magistrate Judge